UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

RONALD L. DAVIS,

                      Plaintiff,                              Case No. 1:13-cv-1231

v.                                                           Honorable Robert J. Jonker

MICHIGAN DEPARTMENT OF
CORRECTIONS et al.,

                      Defendants.
_____/

## OPINION

      This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. The

Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform

Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996), the Court is required to dismiss any prisoner

action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon

which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28

U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se*

complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's

allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504

U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure

to state a claim against Defendants MDOC, Sutton, Property Room Officers Unknown Parties ##1-2,

Young, Lauer, Food Service Director Unknown Party #3, Heffelbower and other unspecified

Unknown Parties. The Court will serve the complaint against Defendants Lehman, Cooper, Tate, Thrush, Allen, Wood, Harding, Dulaney and Darnell.

**Discussion**

I.    Factual allegations

Plaintiff Ronald L. Davis presently is incarcerated by the Michigan Department of Corrections (MDOC) at the Lakeland Correctional Facility (LCF) although the events about which he complains took place when he was housed at the Richard A. Handlon Correctional Facility (MTU). Plaintiff names the MDOC and the following MTU employees as defendants: Corrections Officers (Unknown) Dulaney, (Unknown) Darnell, (Unknown) Lehman, (Unknown) Cooper, (Unknown) Allen, (Unknown) Sutton, (Unknown) Wood and (Unknown) Tate; Nurses (Unknown) Thrush and (Unknown) Harding; Grievance Coordinator C. Heffelbower; Property Room Officers Unknown Parties ##1-2; Assistant Deputy Warden (Unknown) Young; Resident Unit Manager (Unknown) Lauer; Food Service Director Unknown Party #3; and an unspecified number of additional Unknown Parties.

Plaintiff alleges that on June 17, 2013, he filed a grievance against Defendants Dulaney and MDOC and requested protection because he feared that the MDOC and its employees would retaliate against him for writing the grievance. Thus began a series of events, all stemming, Plaintiff alleges, from his June 17, 2013 grievance.

On June 24, 2013, Defendant Dulaney approached Plaintiff in the card room at C-Unit and told Plaintiff that he got the grievance that Plaintiff had filed against him. He told Plaintiff that the grievance would hurt Plaintiff much worse then it would hurt him. When Plaintiff asked

Defendant Dulaney if that was a threat, Defendant Dulaney told Plaintiff that he would not have a good day because he was writing so many grievances.

That same day as he was entering the MTU recreational yard, Defendant Darnell called Plaintiff over and demanded that he give a "shake down." (Compl., docket #1, Page ID#9.) During the shake down Defendant Darnell asked Plaintiff if he was "Davis who locks in C-16?" (*Id.*) After Plaintiff affirmed his identity, Defendant Darnell gave him a "direct order to get your grievance writing ass off of my yard!" (*Id.*) Plaintiff asked Defendant Darnell why he was being ordered off the yard and Defendant Darnell replied, "You wrote a grievance against Dulaney didn't you. Now get the hell off of my yard and go write another grievance!" (*Id.*) Plaintiff told Defendant Darnell that it was wrong to kick him off the yard and he asked to see a Captain. Plaintiff asked to see a Captain because he was afraid to go back to his housing unit where Defendant Dulaney was still working. Plaintiff hoped that a Captain could protect him from being physically harmed. In addition, Plaintiff wanted to inform the Captain about the behavior of Defendants Dulaney and Darnell.

After Plaintiff asked to see a Captain, Defendant Darnell angrily told him "I'm not calling a Captain for you. I'm not Dulaney, I know how to deal with your type!" (*Id.* at Page ID#10.) Defendant Darnell then called out "Are you threatening me? Put your hands behind your back and cuff up." (*Id.* at Page ID#11.) Plaintiff was very fearful and felt that if he cuffed up Defendant Darnell might hurt him. He put his hands in the air and continued asking to see a Captain. Other MTU correctional officers arrived. Defendant Darnell told the other officers that Plaintiff had come up to him with clenched fists and threatened him. Plaintiff kept his hands in the air, believing it was the most submissive position he could take, and continued to ask to see a Captain.

When Defendant Lehman arrived, he pointed his taser gun at Plaintiff. Defendant Lehman told Plaintiff to put his hands behind his back and "cuff up." (*Id.* at Page ID#12.) Plaintiff told Defendant Lehman that he would cuff up when a Captain came because he did not feel safe. Defendant Lehman screamed at Plaintiff to "cuff up now!" (*Id.*) Before Plaintiff had time to react, Defendant Lehman shot Plaintiff with his taser gun causing Plaintiff to suffer terrible pain. Plaintiff believed that the correctional officers were attempting to goad him into acting aggressively. Plaintiff told those assembled "that this is not going to make me do anything to anybody." (*Id.* at Page ID#12.) After hearing Plaintiff's words, Defendant Cooper told Defendant Lehman to "shoot him again." (*Id.*) In response, Defendant Lehman shot Plaintiff with his taser gun. Plaintiff alleges that Defendant Lehman shot him with the taser a second time "to satisfy the defendant(s) sadistic intent to see me suffer in unnecessarily excruciating physical and mental pain." (*Id.*) Plaintiff alleges that at no time during this encounter did he act aggressively "towards anyone in a manner that would warrant the use of excessive force with a deadly weapon." (*Id.* at Page ID#13.) Plaintiff alleges that Defendants' conduct was directed at him because he had filed a grievance against Defendant Dulaney.

Defendant Cooper then took out his taser gun and pointed it "point blank" at Plaintiff's face and told Plaintiff to "cuff up" or he would shoot Plaintiff too. (*Id.* at Page ID#13.) Plaintiff alleges that he was in shock and afraid for his life so he put his hands behind his back and allowed the Defendants to handcuff him. After being handcuffed, Plaintiff was taken to punitive segregation. On the way to punitive segregation, Plaintiff told Defendant Cooper that the taser wires were getting tangled in his legs and he was afraid of tripping. Plaintiff asked if he could get untangled. Defendant Cooper said "I don't care about you tripping you're a tuff guy right? So do

what you want to do! You do think your tuff right?" (*Id.* at Page ID#14.) Plaintiff responded that he did not think he was tough, but he told Defendant Cooper "[C]learly you do!" (*Id.*) After Plaintiff made that comment Defendant Cooper slammed Plaintiff to the ground and pinned Plaintiff down with his knee. Defendant Cooper called out that Plaintiff should stop resisting. Plaintiff alleges that Defendant Cooper did this to justify his decision to slam Plaintiff to the ground "using unnecessary excessive force." (*Id.*) Plaintiff was not trying to resist Defendant Cooper. Defendant Cooper then tightened Plaintiff's handcuffs around his wrist such that the handcuffs cut into Plaintiff's skin and cut off the circulation to Plaintiff's hands, causing them to be numb for hours after the handcuffs were removed.

After a short time in punitive segregation Plaintiff began having sharp pains in his lower back. Plaintiff asked Defendant Tate for his "TENS Unit." (*Id.*) Plaintiff states that a TENS unit is "a medical device that was prescribed . . . by the MDOC's own health service providers to help me cope with my on going chronic back pains." (*Id.*) After asking an unspecified person about whether Plaintiff could have his TENS unit, Defendant Tate told Plaintiff it was a medical problem so Plaintiff should talk to the nurse during rounds the next day. Plaintiff alleges that he suffered unnecessary excruciating pain all night.

The next morning, on June 25, 2013, Plaintiff asked Defendant Thrush for his TENS unit. Plaintiff explained that he was in terrible pain and that he had a medical detail for the TENS unit. Defendant Thrush explained to Plaintiff that he would have to see if Plaintiff was allowed to have the TENS unit while in punitive segregation; if so, Defendant Thrush would get the TENS unit for Plaintiff. Defendant Thrush never returned. Plaintiff also asked Captain Allen for his TENS unit. Like Defendant Thrush, Captain Allen told Plaintiff that he would find out if Plaintiff could

have the TENS unit. Captain Allen never returned. Plaintiff did not receive his TENS unit or any other help for his back, so he continued to suffer tremendous pain.

On June 26, 2013, Plaintiff once again asked Defendant Thrush for help getting his TENS unit or any other help for his back pain. Defendant Thrush said he would check if Plaintiff could have his TENS unit, but he never returned. Plaintiff continued to suffer. Plaintiff tried talking with Lieutenant Wood about getting the TENS unit, but Lieutenant Wood told Plaintiff he did not have time to talk. Lieutenant Wood said that he would come back, but he never did. Plaintiff continued to suffer. For another two days Plaintiff tried to get his TENS unit because he was in terrible pain. Plaintiff alleges that he felt suicidal because he was in excruciating pain, he could not sleep and no one seemed to want to help him. Plaintiff could not believe what was happening to him just because he filed a grievance.

On June 28, 2013, Plaintiff asked Defendant Harding to help him get his TENS unit. He explained to Defendant Harding that he was in terrible pain and had been trying to get the TENS unit since June 24, 2013. Defendant Harding told Plaintiff that she would send an email to the property room and to Defendant Sutton to try and get the TENS unit. Defendant Harding never returned. Plaintiff did not get his TENS unit.

On June 30, 2013, Plaintiff again spoke with Defendant Harding and asked her for anything to help deal with his back pain. Defendant Harding told Plaintiff that she would send another e-mail to the Defendant Property Room Officers Unknown Parties ##1-2, because the TENS unit was in the property room and "neither of them wanted to go into" Plaintiff's property and get the TENS unit out. (*Id.* at Page ID#17.) Later that same day, Plaintiff spoke with Lieutenant Scott, for the first time, and explained to her what was going on. Lieutenant Scott got very upset and told

Plaintiff that she would personally make sure that Plaintiff got the TENS unit. Lieutenant Scott came back to Plaintiff's cell about 20 minutes later with his TENS unit. Plaintiff was made to suffer for six days before he received his TENS unit. None of the other defendants with whom he had spoken ever helped him get his TENS unit nor did they offer to help him get any other kind of pain relief.

On June 30, 2013, Plaintiff did not eat breakfast or lunch. Defendant Dulaney was the officer assigned to distribute Plaintiff's breakfast and lunch food trays. When Defendant Dulaney came to deliver his meals, Plaintiff saw a sinister smile on Defendant Dulaney's face and was afraid to eat anything that Defendant Dulaney delivered.

On July 2, 2013, Defendants Young and Lauer told Plaintiff that they were not going to allow him back in the MTU compound and that he would be transferred once he finished his punitive segregation. Plaintiff alleges that this transfer was done maliciously, was motivated by Defendants Dulaney and Darnell and was intended to retaliate against Plaintiff.

On July 9, 2013, while Plaintiff was still in punitive segregation, he began fasting for Ramadan. Plaintiff alleges that the next day, July 10, 2013, he was poisoned when he ingested the bag of food he was given by Defendants Food Service Director Unknown Party #3 and other Unknown Parties to break his Ramadan fast. Plaintiff's bag of food arrived at approximately 1:30 p.m. Within the bag were foods that required refrigeration unless consumed right away, including meat products. Plaintiff was unable to eat the contents of his Ramadan food bag until sunset, well over 5½ hours after he received it. During that time, Plaintiff's Ramadan food bag was kept unrefrigerated in his cell at well over 80 degrees. Plaintiff alleges that Defendants Food Service

Director Unknown Party #3 and other Unknown Parties knew that Plaintiff would not be able to break his religious fast until sunset, although they delivered the bag to his cell at 1:30 p.m.

On July 10, 2013, after Plaintiff ate the contents of his Ramadan food bag, he got very sick. Plaintiff informed Officer Castle that he was feeling ill, was vomiting and using the toilet, his stomach was upset, he was dizzy and he was feeling weak. Plaintiff also told Officer Castle that the symptoms came on suddenly. Plaintiff asked to see a nurse. Officer Castle told Plaintiff that none of the nurses were currently at work, but that she would e-mail a nurse about Plaintiff's symptoms and find out what to do. When Officer Castle returned she told Plaintiff that the nurse believed his symptoms sounded like food poisoning and the nurse recommended that he "drink water and try to flush it out because food poisoning just has to run its course." (*Id.* at Page ID#19.)

Plaintiff alleges that Defendants Food Service Director Unknown Party #3 and other Unknown Parties were all aware that Plaintiff would not be able to refrigerate his Ramadan food bag in his cell. As a result, Plaintiff alleges they knowingly forced him to store his food in a way that would create a high risk of a serious health problem when he ate the food. Plaintiff believes that Defendants Food Service Director Unknown Party #3 and other Unknown Parties were motivated by a malicious intent to force him to stop practicing his religion by making it impossible for him not to fast. Plaintiff alleges that this situation tested his faith because the only food he had available was the food given to him by Defendants Food Service Director Unknown Party #3 and other Unknown Parties. Plaintiff was forced to eat only on days where the food in his Ramadan food bag did not need to be refrigerated.

Plaintiff alleges that Defendant Heffelbower and Unknown Parties refused to acknowledge or give a grievance identifier number to four grievances that Plaintiff submitted to

them.[1]  The four grievances are: (1) a July 6, 2013, grievance against Defendants Young, Lauer and MDOC for ordering a retaliatory transfer; (2) a July 11, 2013, grievance against Defendant Heffelbower, the MDOC and Unknown Parties for violating his constitutionally protected right to file a grievance;[2] (3) a July 11, 2013, grievance against Defendants Food Service Director Unknown Party #3, MDOC and all other Unknown Parties for violating MDOC PD 03.03.130 ¶E and for cruel and unusual punishment; and (4) a July 11, 2013 grievance against Defendant Heffelbower, MDOC and all other Unknown Parties for violating Plaintiff's constitutionally protected rights to file a grievance.  Plaintiff alleges that Defendants Heffelbower and Unknown Parties violated MDOC Policy Directive (PD) 03.02.130 ¶W by failing to give grievance identifier numbers to his submissions.  Additionally, Plaintiff alleges that his grievances were never returned to him because Defendants Heffelbower and Unknown Parties were attempting to prevent him from filing a lawsuit. Finally, Plaintiff alleges that Defendants Heffelbower and Unknown Parties' conduct was retaliatory.

Plaintiff alleges that if Defendants Dulaney and Darnell had not retaliated against him for filing a grievance against Defendant Dulaney in the first place, then none of the other defendants would have violated his constitutionally protected rights, state law and/or MDOC policy.  Plaintiff alleges that the MDOC failed to protect Plaintiff from Defendants' retaliation and was deliberately indifferent and/or grossly negligent with respect to its obligation to keep Plaintiff safe.  Plaintiff alleges that Defendants took adverse action against Plaintiff for engaging in protected conduct, used

---

[1] In a letter written August 6, 2013 to the MTU Warden and the Director of the MDOC, Plaintiff requested that video footage of the segregation/detention wing from June 24, 2013, to July 20, 2013, be preserved.  Apparently, Plaintiff sought to have this video footage preserved so that he could demonstrate that he handed each of these grievances to a correctional officer for delivery to Defendants Heffelbower and Unknown Parties.

[2] Plaintiff filed this grievance because Defendant Heffelbower and Unknown Parties refused to acknowledge a June 26, 2013, grievance that Plaintiff filed against Defendants Tate, Allen, Thrush and Wood for denying him his TENS unit and any other medical treatment in connection with his back pain.

excessive force against Plaintiff, denied Plaintiff medical treatment and violated his due process rights.

Plaintiff asserts claims for the following: retaliation; denial of equal protection; cruel and unusual punishment; violation of due process; violation of MDOC policies and state law, including conduct unbecoming of an officer, dereliction of duty and falsification or altering documents; inhumane treatment; and discrimination and harassment.

For relief, Plaintiff requests compensatory, emotional and punitive damages, along with an order directing the MDOC to fire all defendants, create a review board to investigate all occasions in which a taser is used, create a grievance board of review to receive and investigate all grievances, create a religious review board to direct the MDOC in all matters related to religion, and order that all federal funding to the MDOC be terminated until the MDOC creates the review boards previously identified.

II.     Immunity

Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1993). Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In numerous unpublished opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from suit under the Eleventh Amendment.

*See, e.g., McCoy v. Michigan*, 369 F. App'x 646, 653–54 (6th Cir. 2010); *Turnboe v. Stegall*, No. 00–1182, 2000 WL 1679478, at *2 (6th Cir. Nov. 1, 2000). In addition, the State of Michigan (acting through the MDOC) is not a "person" who may be sued under § 1983 for money damages. *See Lapides v. Bd. of Regents*, 535 U.S. 613, 617 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989)). Therefore, the MDOC must be dismissed from this action.

III.    <u>Failure to state a claim</u>

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility

standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## A. Eighth Amendment Claims

### 1. Excessive Force

Plaintiff alleges that Defendant Lehman used excessive force when he tazed Plaintiff two times without cause. Additionally, Plaintiff alleges that Defendant Cooper used excessive force when he slammed Plaintiff, who was handcuffed, to the ground, pinned Plaintiff down with his knee and then tightened Plaintiff's handcuffs to the point that they cut off Plaintiff's circulation and caused Plaintiff's hands to go numb. Plaintiff alleges that he did not provoke Defendants Lehman or Cooper and that their uses of force were unnecessary and intended solely to make Plaintiff suffer.

The Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of a crime. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *See Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981); *Trop v. Dulles*, 356 U.S. 86, 101 (1958). The Eighth Amendment also prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and

wanton infliction of pain." *Rhodes*, 452 U.S. at 346. Among unnecessary and wanton infliction of pain are those that are "totally without penological justification." *Id.*

Plaintiff's excessive force claims must be analyzed under the Supreme Court authority limiting the use of force against prisoners. This analysis must be made in the context of the constant admonitions by the Supreme Court regarding the deference that courts must accord to prison or jail officials as they attempt to maintain order and discipline within dangerous institutional settings. *See, e.g.*, *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986).

Generally, restrictions and even harsh conditions of confinement are not necessarily cruel and unusual punishment prohibited by the Eighth Amendment. *Rhodes*, 452 U.S. at 347. The Supreme Court has held that "whenever guards use force to keep order," the standards enunciated in *Whitley*, 475 U.S. at 312, should be applied. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *see also Wilkins v. Gaddy*, 559 U.S. 34, 36-39 (2010). Under *Whitley*, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7; *Wilkins*, 559 U.S. at 37. In determining whether the use of force is wanton and unnecessary, the court should evaluate the need for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and any efforts made to temper the severity of the forceful response. *Hudson*, 503 U.S. at 6-7 (citing *Whitley*, 475 U.S. at 321); *accord Griffin v. Hardrick*, 604 F.3d 949, 953-54 (6th Cir. 2010); *McHenry v. Chadwick*, 896 F.2d 184 (6th Cir. 1990). Physical restraints are constitutionally permissible where there is penological justification for their use. *Rhodes*, 452 U.S. at 346; *Jones v. Toombs*, No. 95-1395, 1996 WL 67750, at *1 (6th

Cir. Feb. 15, 1996); *Hayes v. Toombs*, No. 91-890, 1994 WL 28606, at *1 (6th Cir. Feb. 1, 1994);

*Rivers v. Pitcher*, No. 95-1167, 1995 WL 603313, at *2 (6th Cir. Oct. 12, 1995).

At this stage of the proceedings, the Court finds that Plaintiff's allegations are

sufficient to warrant service upon Defendants Lehman and Cooper.

## 2.    Deliberate Indifference to Serious Medical Needs

Plaintiff alleges that Defendants Tate, Thrush, Allen, Wood, Harding, Sutton and

Property Room Officers Unknown Parties ##1-2 were deliberately indifferent to his serious medical

needs when they failed to give Plaintiff his prescribed TENS unit or any other kind of relief for his

back pain.  Plaintiff was without his TENS unit for six days before Lieutenant Scott obtained it for

him.

The Eighth Amendment obligates prison authorities to provide medical care to

incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary

standards of decency.  *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).  The Eighth Amendment is

violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.

*Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective

component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To satisfy the objective component, the

plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the

inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.

*Id.*  The objective component of the adequate medical care test is satisfied "[w]here the seriousness

of a prisoner's need[ ] for medical care is obvious even to a lay person."  *Blackmore v. Kalamazoo

Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004).  If, however the need involves "minor maladies or

- 14 -

non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate

must "place verifying medical evidence in the record to establish the detrimental effect of the delay

in medical treatment." *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires an inmate to show that prison officials have "a

sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867

(6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more

than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts

or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*

Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

> [D]eliberate indifference to serious medical needs of prisoners constitutes the
> "unnecessary and wanton infliction of pain" proscribed by the Eighth
> Amendment. This is true whether the indifference is manifested by prison
> doctors in their response to the prisoner's needs or by prison guards in
> intentionally denying or delaying access to medical care or intentionally
> interfering with the treatment once prescribed. Regardless of how evidenced,
> deliberate indifference to a prisoner's serious illness or injury states a cause
> of action under § 1983.

*Estelle*, 429 U.S. at 104-05 (internal citations omitted).

At this stage of the proceedings, the Court finds that Plaintiff's allegations are

sufficient to warrant service upon Defendants Tate, Thrush, Allen, Wood and Harding. However,

Plaintiff's allegations against Defendants Sutton and Property Room Officers Unknown Parties ##1-

2 are insufficient to state a claim. With respect to Defendant Sutton, Plaintiff alleges only that

Defendant Harding sent him an email to try and get Plaintiff's TENS unit. With respect to

Defendants Property Room Officers Unknown Parties ##1-2, Plaintiff alleges that Defendant

Harding sent two e-mails to Defendants Property Room Officers Unknown Party ##1-2 because Plaintiff's TENS unit was in the property room and "neither of them wanted to go into" Plaintiff's property and get the TENS unit out. (*Id.* at Page ID#17.) These allegations are insufficient to establish that Defendants Sutton and Property Room Officers Unknown Party ##1-2 were aware that Plaintiff had a serious medical need. Plaintiff therefore fails to allege facts that demonstrate the subjective component of the deliberate indifference standard. Consequently, Defendants Sutton and Property Room Officers Unknown Party ##1-2 will be dismissed.

### 3.     Deliberate Indifference to Health or Safety

Plaintiff alleges that Defendants Dulaney and Darnell subjected him to cruel and unusual punishment by verbally threatening and harassing him. Plaintiff also claims that on June 30, 2013, Defendant Dulaney sinisterly smiled at Plaintiff after delivering his breakfast and lunch trays, causing Plaintiff to be too afraid to eat.

Additionally, Plaintiff alleges that on July 10, 2013, Defendant Unknown Party #3 and additional Unknown Parties subjected him to cruel and unusual punishment by giving him a Ramadan food bag that contained items that required refrigeration at 1:30 p.m. knowing that Plaintiff had no way to refrigerate the food and that Plaintiff would not be eating the food until sundown, some 5 ½ hours after receiving it. Plaintiff alleges that he suffered from food poisoning after eating his Ramadan meal. Plaintiff alleges that after suffering from food poisoning he would only eat on the days that his Ramadan food bag had items that did not need refrigeration.

As discussed above, the Eighth Amendment prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). "Not every unpleasant experience a prisoner

might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. Instead, the Eighth Amendment is concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted).

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer*, 511 U.S. at 834 (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

Plaintiff claims that Defendants Dulaney and Darnell verbally harassed him. The use of harassing or degrading language by a prison official, although unprofessional and deplorable, does not rise to constitutional dimensions. *See Ivey*, 832 F.2d at 954-55; *see also Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (harassment and verbal abuse do not constitute the type of infliction of pain that the Eighth Amendment prohibits); *Violett v. Reynolds,* No. 02-6366, 2003 WL 22097827, at *3 (6th Cir. Sept. 5, 2003) (verbal abuse and harassment do not constitute punishment that would support an Eighth Amendment claim); *Thaddeus-X v. Langley*, No. 96-1282, 1997 WL 205604, at *1 (6th Cir. Apr. 24, 1997) (verbal harassment is insufficient to state a claim); *Murray v. U.S. Bureau of Prisons*, No. 95-5204, 1997 WL 34677, at *3 (6th Cir. Jan. 28, 1997) ("Although we do not condone the alleged statements, the Eighth Amendment does not afford us the power to correct every action, statement or attitude of a prison official with which we might disagree."); *Clark v. Turner*, No. 96-3265, 1996 WL 721798, at *2 (6th Cir. Dec. 13, 1996) ("Verbal harassment and

idle threats are generally not sufficient to constitute an invasion of an inmate's constitutional rights."); *Brown v. Toombs*, No. 92-1756, 1993 WL 11882 (6th Cir. Jan. 21, 1993) ("Brown's allegation that a corrections officer used derogatory language and insulting racial epithets is insufficient to support his claim under the Eighth Amendment.").

Moreover, Plaintiff's allegation that Defendant Dulaney's sinister smile caused him not to eat the food Defendant Dulaney delivered, fails to state an Eighth Amendment claim. *See White v. Hall*, No. 1:2008-cv-498, 2008 WL 2783256, at *2 (W.D. Mich. July 17, 2008) (finding that "use of an "angry, hostile" voice and "intimidating" demeanor fall far short of the requisite denial of 'minimal civilized measure of life's necessities" or the "unnecessary and wanton infliction of pain."). Consequently, Plaintiff's Eighth Amendment claim against Defendants Dulaney and Darnell will be dismissed.

With respect to Defendant Food Service Director Unknown Party #3 and other Unknown Parties, Plaintiff alleges that he suffered a single incident of food poisoning. Plaintiff complains that he became ill after consuming items from his Ramadan food bag that were left unrefrigerated for many hours. Additionally, Plaintiff alleges that after his alleged food poisoning experience, he only consumed items from his Ramadan food bag that did not require refrigeration.

In general, convicted criminals are not in a position to complain about the mere unpleasantness of prison meals. *See Ivey*, 832 F.2d at 954. Moreover, a single incident of unintended food poisoning does not amount to a violation of a prisoner's constitutional rights. *See George v. King*, 837 F.2d 705, 707 (7th Cir. 1988); *accord Green v. Atkinson*, 623 F.3d 278, 281 (5th Cir. 2010) ; *Green v. Tudor*, 685 F. Supp. 678, 694 (W.D. Mich. 2010) (citing *George*); *Islam v. Jackson*, 782 F. Supp. 1111, 1114-15 (E.D. Va. 1992) (serving one meal contaminated with

maggots and meals under unsanitary conditions for thirteen days was not cruel and unusual punishment, even though inmate suffered symptoms of food poisoning on one occasion). Allegations about temporary inconveniences, e.g., being deprived of a lower bunk, subjected to a flooded cell, or deprived of a working toilet, do not demonstrate that the conditions fell beneath the minimal civilized measure of life's necessities as measured by a contemporary standard of decency. *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001); *see also J.P. v. Taft*, 439 F. Supp. 2d 793, 811 (S.D. Ohio 2006) ("[M]inor inconveniences resulting from the difficulties in administering a large detention facility do not give rise to a constitutional claim." (internal citation omitted)); *Hartsfield v. Vidor,* 199 F.3d 305, 310 (6th Cir. 1999) (stating that "deprivations of fresh water and access to the toilet for a 20-hour period, while harsh, were not cruel and unusual punishment") (citing *Stephens v. Carter Cnty Jail*, 816 F.2d 682 (6th Cir. 1987))

Plaintiff alleges little more than a single incident of food poisoning. Although Plaintiff subsequently did not eat certain of his bagged items during the remainder of Ramadan, Plaintiff does not allege that he was denied food altogether. Instead, he makes clear that he ate items from his Ramadan food bag that did not require refrigeration. Because he alleges only temporary inconveniences, Plaintiff fails to state an Eighth Amendment claim against Defendant Food Service Director Unknown Party #3 and other Unknown Parties.

## B.     First Amendment Claims

### 1.     Retaliation: Grievances

Plaintiff alleges that Defendants Dulaney and Darnell retaliated against him for writing a grievance naming Defendant Dulaney. Plaintiff alleges that Defendant Dulaney retaliated against him by making a number of verbal threats. First, Plaintiff alleges that Defendant Dulaney

told Plaintiff that if he thought his grievance against Defendant Dulaney was going to hurt Defendant Dulaney he was wrong, because "its going to end up hurting [Plaintiff] way wors[e] then it will ever hurt" Defendant Dulaney. (Compl., docket #1, Page ID#8.)  Second, Defendant Dulaney said to Plaintiff "I bet you won't have a good day today since you like writing grievances so much!" (*Id.* at Page ID#9.)  Finally, Defendant Dulaney said "enjoy your yard if you can." (*Id.*)  Shortly thereafter Plaintiff went to the recreational yard where Defendant Darnell demanded a "shake down," determined Plaintiff's identity and said "I'm giving you a direct order to get your grievance writing ass off of my yard!" (*Id.*)  When Plaintiff asked why he was being ordered off the yard, Defendant Darnell said "you wrote a grievance against Dulaney didn't you, Now get the hell off of my yard and go write another grievance!" (*Id.*)

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish that:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  He must show a causal connection between Defendants' adverse actions and his protected conduct.  *King v. Zamiara*, 680 F.3d 686, 694-95 (6th Cir. 2012) ("[P]rotected speech causes an adverse action if the speech motivates an individual actor to take act[ion] that then proximately cause[s] an adverse action.").

Plaintiff's allegations satisfy the three *Thaddeus-X* requirements. First, the filing of a prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *See Smith*, 250 F.3d at 1037; *Hall v. Nusholtz*, No. 99-2442, 2000 WL 1679458, at *2 (6th Cir. Nov. 1, 2000); *Burton v. Rowley*, No. 00-1144, 2000 WL 1679463, at *2 (6th Cir. Nov. 1, 2000). Second, a specific threat of harm may satisfy the adverse-action requirement if it would deter a person of ordinary firmness from exercising his or her First Amendment rights, *see, e.g., Thaddeus-X*, 175 F.3d at 396, 398 (threat of physical harm); *Smith v. Yarrow*, 78 F. App'x 529, 542 (6th Cir. 2003) (threat to change drug test results). Finally, Plaintiff's allegations convey that, if true, Defendants' threats were motivated by Plaintiff's grievance.

At this stage in the proceedings, the Court finds that Plaintiff's allegations are sufficient to warrant service upon Defendants Dulaney and Darnell.

## 2. Retaliation: Transfer

Plaintiff alleges that Defendants Young and Lauer retaliated against him by ordering that he be transferred once he was released from punitive segregation. Additionally, Plaintiff alleges that Defendants Young and Lauer's decision to transfer him "was done with the malicious intent of retaliation against me because this transfer was solely motivated by the retaliatory actions against [Plaintiff] by Defendants Dulaney and Darnell." (Compl., docket #1, Page ID#18.) Finally, in a grievance attached as Exhibit 14 to Plaintiff's Complaint, Plaintiff alleges that the decision to transfer him was intended to prevent him from filing a lawsuit against MTU employees.

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987); *Vega v. DeRobertis*, 598 F. Supp. 501, 506 (C.D.

Ill. 1984), *aff'd*, 774 F.2d 1167 (7th Cir. 1985). However, "alleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555. The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The court need not accept "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . ." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

Specifically, where Plaintiff alleges a retaliation claim "conclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also Skinner v. Bolden*, 89 F. App'x 579, 579-80 (6th Cir. 2004) (without more, conclusory allegations of temporal proximity are not sufficient to show a retaliatory motive); *Birdo v. Lewis*, No. 95-5693, 1996 WL 132148, at *1 (6th Cir. Mar. 21, 1996); *Fields v. Powell*, No. 94-1674, 1995 WL 35628, at *2 (6th Cir. Jan. 30, 1995); *Williams v. Bates*, No. 93-2045, 1994 WL 677670, at *3 (6th Cir. Dec. 2, 1994).

Even if Plaintiff could establish that his transfer from MTU was an adverse action, he fails to allege the protected conduct in which he was engaged and the causal connection between his protected conduct and the decision to transfer him. Assuming Plaintiff would assert that his

grievance writing against Defendant Dulaney and Darnell motivated the transfer, he nevertheless fails to set forth any facts to suggest that a causal connection exists between his writing grievances and Defendants Young and Lauer's decision to transfer him. *See Thaddeus-X*, 175 F.3d at 394; *see also King*, 680 F.3d at 695 ("To show causation in a retaliation claim, a plaintiff must show (1) that the adverse action was proximately caused by an individual defendant's acts, and (2) that the defendant taking those acts was 'motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.'"). Plaintiff makes no factual allegations linking his grievance writing against two individuals to the allegedly adverse action of other individuals. Because his claim is wholly conclusory, Plaintiff fails to state a retaliation claim against Defendants Young and Lauer. Consequently, they will be dismissed.

### 3.  Retaliation: Access to Courts

Plaintiff alleges that Defendants Heffelbower and Unknown Parties retaliated against him by not acknowledging four grievances or giving them a grievance identifier number, and by failing to return the grievances to Plaintiff. Plaintiff alleges that in engaging in the foregoing retaliatory conduct, Defendants were "attempt[ing] to derail any attempt [Plaintiff] would make to file a lawsuit against their co-workers." (Compl., docket #1, Page ID##21-23.) Plaintiff has failed to sufficiently allege any adverse action. Even if Plaintiff had been improperly prevented from filing a grievance, his right of access to the courts to petition for redress of his grievances (i.e., by filing a lawsuit) cannot be compromised by his inability to file institutional grievances. *See*, *e.g.*, *Lewis v. Casey*, 518 U.S. 343, 355 (1996) (requiring actual injury); *Bounds v. Smith*, 430 U.S. 817, 821-24 (1977). The exhaustion requirement only mandates exhaustion of available administrative remedies. *See* 42 U.S.C. § 1997e(a). If Plaintiff were improperly denied access to the grievance process, the

process would be rendered unavailable, and exhaustion would not be a prerequisite for initiation of a civil rights action. In light of the foregoing, the Court finds that Plaintiff fails to state a cognizable claim against Defendant Heffelbower and Unknown Parties.

### 4. Interference with Religion

Plaintiff alleges that Defendant Food Service Director Unknown Party #3 and other Unknown Parties interfered with the practice of his religion by providing him with Ramadan food bags that contained items requiring refrigeration that he could not eat for fear of getting food poisoning.

While "incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates clearly retain First Amendment protection to freely exercise their religion, *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987), subject to reasonable restrictions and limitations related to legitimate penological interests. *Id.* at 350-53; *accord Turner v. Safley*, 482 U.S. 78, 89 (1987). First Amendment protection extends to all religious beliefs, and guaranties "religious liberty and equality to the infidel, the atheist, or the adherent of a non-Christian faith . . .." *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 615 (1989).

To state a free exercise claim, a plaintiff must allege facts from which an inference may be drawn that the government has placed "a substantial burden on the observation of a central religious belief or practice." *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989). Likewise, the Religious Land Use and Institutionalized Persons Act (RLUIPA) provides in pertinent part that, "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden . . ." furthers "a compelling governmental interest" and is done so by the least restrictive means.

- 24 -

42 U.S.C. § 2000cc-1(a)(1)-(2). RLUIPA's institutionalized-persons provision alleviates exceptional government-created burdens on private religious exercise. *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005).

Although RLUIPA does not define "substantial burden," courts apply the traditional substantial burden test, as defined by the Supreme Court's free exercise jurisprudence. *Episcopal Student Found. v. City of Ann Arbor*, 341 F. Supp. 2d 691, 701 (E.D. Mich. 2004). A "substantial burden" requires something more than an incidental effect on religious exercise. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988) (a substantial burden has "a tendency to coerce individuals into acting contrary to their religious beliefs"); *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141 (1987) (there is a substantial burden where a regulation puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs"); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1226-27 (11th Cir. 2004) (a substantial burden must place more than an inconvenience on religious exercise); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) (substantial burden is "one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise ... effectively impracticable").

Plaintiff's allegation that his Ramadan food bag contained items that he did not eat entirely fails to demonstrate that Defendant Food Service Director Unknown Party #3 and other Unknown Parties infringed upon the Plaintiff's religious practice. Plaintiff does not allege that Defendant Food Service Director Unknown Party #3 and other Unknown Parties refused to accommodate Plaintiff's religious practice. Instead, Plaintiff alleges that he did not like the accommodation that had been made. Although Plaintiff may have preferred more or different food

inside his Ramadan bag, the facts he has alleged fail to show, or support a reasonable inference, that Defendant Food Service Director Unknown Party #3 and other Unknown Parties imposed a substantial burden on his ability to freely exercise his religion.

## C.     Fourteenth Amendment-Due Process

Plaintiff alleges that his due process rights were violated when Defendant Heffelbower and Unknown Parties failed to acknowledge, provide a grievance identifier number for or return four grievances.

Plaintiff has no due process right to file a prison grievance. The Sixth Circuit and other circuit courts have held that there is no constitutionally protected due process right to an effective prison grievance procedure. *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569-70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Michigan law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994). Because Plaintiff has no liberty interest in the grievance process, Defendants' conduct did not deprive him of due process. Consequently, Plaintiff fails to state a due process claim against Defendants Heffelbower and Unknown Parties.

## D.     Equal Protection

Plaintiff largely fails to allege any facts to support an equal protection claim against any Defendant. Reading Plaintiff's complaint indulgently as the Court must, *Haines*, 404 U.S. at

520, to the extent Plaintiff makes any allegations that could even arguably raise an equal protection claim, he alleges only that Defendant Food Service Director Unknown Party #3 and other Unknown Parties "deprived [him] of the same types of foods that everybody else who participated in the fast was being provided with." (Compl., docket #1, Page ID#20.)

The Equal Protection Clause commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. A state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Plaintiff does not suggest that he is a member of a suspect class, and "prisoners are not considered a suspect class for purposes of equal protection litigation." *Jackson v. Jamrog,* 411 F.3d 615, 619 (6th Cir. 2005); *see also Wilson v. Yaklich,* 148 F.3d 596, 604 (6th Cir.1998). In addition, Plaintiff does not allege any facts demonstrating that a fundamental right had been interfered with by any Defendant.

Because neither a fundamental right nor a suspect class is at issue, Plaintiff's claim is reviewed under the rational basis standard. *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby,* 470 F.3d 286, 298 (6th Cir. 2006). "Under rational basis scrutiny, government action amounts to a constitutional violation only if it 'is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational.'" *Id.* (quoting *Warren v. City of Athens,* 411 F.3d 697, 710 (6th Cir. 2005)). To prove his equal protection claim, Plaintiff must demonstrate "intentional and arbitrary discrimination" by the state; that is, he must demonstrate that he "has been intentionally treated differently from others

similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Plaintiff has not alleged any facts to suggest that Defendants Food Service Director Unknown Party #3 and other Unknown Parties treated him differently than any of the other prisoners who participated in the Ramadan fast. Moreover, even if Plaintiff had been treated differently, Plaintiff has failed to allege any facts to suggest that there was no rational basis for the difference in treatment. While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal,* 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Plaintiff concludes that he "was deprived of the same types of foods that everybody else who participated in the fast was being provided," (Compl., docket #1, Page ID#20), but nowhere does he allege any facts to suggest that any prisoner who engaged in the Ramadan fast received anything other than the same Ramadan food bag that Plaintiff received. Consequently, he fails to state an equal protection claim.

### E.        State Law Claims

Plaintiff sets out a laundry list of state-law claims, including, violation of MDOC policy, conduct unbecoming a department employee, dereliction of duty and falsification or altering documents. Section 1983 does not provide redress for a violation of a state law. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994). Plaintiff's assertion that Defendants violated state law therefore fails to state a claim under § 1983.

Moreover, to the extent that Plaintiff seeks to invoke this Court's supplemental jurisdiction over a state-law claim against a defendant where the federal claim against that defendant will be dismissed, the Court declines to exercise jurisdiction. In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993). Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *Id.* Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012). Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction. Accordingly, Plaintiff's state-law claims against Defendants MDOC, Sutton, Property Room Officers Unknown Parties ##1-2, Young, Lauer, Food Service Director Unknown Party #3, other unspecified Unknown Parties and Heffelbower will be dismissed without prejudice.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants MDOC, Sutton, Property Room Officers Unknown Parties ##1-2, Young, Lauer, Food Service Director Unknown Party #3, other unspecified Unknown Parties and Heffelbower will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court will serve the complaint against Defendants Lehman, Cooper, Tate, Thrush, Allen, Wood, Harding, Dulaney and Darnell.

An Order consistent with this Opinion will be entered.


                                        _____/s/Robert J. Jonker_____
                                           ROBERT J. JONKER
                                        UNITED STATES DISTRICT JUDGE
Dated:  March 25, 2014