UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD LAMONT DAVIS,

        Plaintiff,

v.                                                                   Case No. 1:13-cv-1231
                                                                     Hon. Robert J. Jonker

MICHIGAN DEPARTMENT OF
CORRECTIONS, *et al.*,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

      This is a *pro se* civil rights action brought by a state prisoner pursuant to 42 U.S.C.

§ 1983.  This matter is now before the Court on a motion for summary judgment filed by the eight

remaining defendants Jamall Dulaney, William Darnell, Jeff Lehman, Marvin Cooper, Rodney

Allen, Kevin Wood, William Thrush, Barbara Harding and Markell Tate (docket no. 24).

**I.      Plaintiff's complaint**

      Plaintiff is incarcerated by the Michigan Department of Corrections (MDOC).  The

claims in plaintiff's 30-page complaint allegedly occurred while he was housed at the Richard A.

Handlon Correctional Facility (MTU).  Plaintiff's complaint named the MDOC and the following

MTU employees: Corrections Officers (Unknown) Dulaney, (Unknown) Darnell, (Unknown)

Lehman, (Unknown) Cooper, (Unknown) Allen, (Unknown) Sutton, (Unknown) Wood and

(Unknown) Tate; Nurses (Unknown) Thrush and (Unknown) Harding; Grievance Coordinator C.

Heffelbower; Property Room Officers Unknown Parties ##1-2; Assistant Deputy Warden

(Unknown) Young; Resident Unit Manager (Unknown) Lauer; Food Service Director Unknown

Party #3; and an unspecified number of additional Unknown Parties. *See* Compl. (docket no. 1 at pp. ID## 4-7); Opinion (docket no. 6 at p. ID# 101).   After initial screening of the complaint, the following defendants remain in this action: Jamall Dulaney, William Darnell, Jeff Lehman, Marvin Cooper, Rodney Allen, Kevin Wood, William Thrush, Barbara Harding and Markell Tate. *See* Opinion (docket no. 6 at p. ID# 128).

The Court previously summarized the allegations in the complaint in pertinent part as follows:

> Plaintiff alleges that on June 17, 2013, he filed a grievance against Defendants Dulaney and MDOC and requested protection because he feared that the MDOC and its employees would retaliate against him for writing the grievance. Thus began a series of events, all stemming, Plaintiff alleges, from his June 17, 2013 grievance.
>
> On June 24, 2013, Defendant Dulaney approached Plaintiff in the card room at C-Unit and told Plaintiff that he got the grievance that Plaintiff had filed against him.  He told Plaintiff that the grievance would hurt Plaintiff much worse then it would hurt him.  When Plaintiff asked Defendant Dulaney if that was a threat, Defendant Dulaney told Plaintiff that he would not have a good day because he was writing so many grievances.
>
> That same day as he was entering the MTU recreational yard, Defendant Darnell called Plaintiff over and demanded that he give a "shake down." (Compl., docket #1, Page ID#9.)  During the shake down Defendant Darnell asked Plaintiff if he was "Davis who locks in C-16?" (*Id.*)  After Plaintiff affirmed his identity, Defendant Darnell gave him a "direct order to get your grievance writing ass off of my yard!" (*Id.*)  Plaintiff asked Defendant Darnell why he was being ordered off the yard and Defendant Darnell replied, "You wrote a grievance against Dulaney didn't you.  Now get the hell off of my yard and go write another grievance!" (*Id.*) Plaintiff told Defendant Darnell that it was wrong to kick him off the yard and he asked to see a Captain.  Plaintiff asked to see a Captain because he was afraid to go back to his housing unit where Defendant Dulaney was still working.  Plaintiff hoped that a Captain could protect him from being physically harmed.  In addition, Plaintiff wanted to inform the Captain about the behavior of Defendants Dulaney and Darnell.
>
> After Plaintiff asked to see a Captain, Defendant Darnell angrily told him "I'm not calling a Captain for you. I'm not Dulaney, I know how to deal with your

type!"  (*Id.* at Page ID#10.)  Defendant Darnell then called out "Are you threatening me?  Put your hands behind your back and cuff up."  (*Id.* at Page ID#11.)  Plaintiff was very fearful and felt that if he cuffed up Defendant Darnell might hurt him.  He put his hands in the air and continued asking to see a Captain.  Other MTU correctional officers arrived.  Defendant Darnell told the other officers that Plaintiff had come up to him with clenched fists and threatened him.  Plaintiff kept his hands in the air, believing it was the most submissive position he could take, and continued to ask to see a Captain.

When Defendant Lehman arrived, he pointed his taser gun at Plaintiff. Defendant Lehman told Plaintiff to put his hands behind his back and "cuff up."  (*Id.* at Page ID#12.)  Plaintiff told Defendant Lehman that he would cuff up when a Captain came because he did not feel safe.  Defendant Lehman screamed at Plaintiff to "cuff up now!"  (*Id.*)  Before Plaintiff had time to react, Defendant Lehman shot Plaintiff with his taser gun causing Plaintiff to suffer terrible pain.  Plaintiff believed that the correctional officers were attempting to goad him into acting aggressively. Plaintiff told those assembled "that this is not going to make me do anything to anybody."  (*Id.* at Page ID#12.)  After hearing Plaintiff's words, Defendant Cooper told Defendant Lehman to "shoot him again."  (*Id.*)  In response, Defendant Lehman shot Plaintiff with his taser gun.  Plaintiff alleges that Defendant Lehman shot him with the taser a second time "to satisfy the defendant(s) sadistic intent to see me suffer in unnecessarily excruciating physical and mental pain." (*Id.*)  Plaintiff alleges that at no time during this encounter did he act aggressively "towards anyone in a manner that would warrant the use of excessive force with a deadly weapon."  (*Id.* at Page ID#13.)  Plaintiff alleges that Defendants' conduct was directed at him because he had filed a grievance against Defendant Dulaney.

Defendant Cooper then took out his taser gun and pointed it "point blank" at Plaintiff's face and told Plaintiff to "cuff up" or he would shoot Plaintiff too.  (*Id.* at Page ID#13.)  Plaintiff alleges that he was in shock and afraid for his life so he put his hands behind his back and allowed the Defendants to handcuff him.  After being handcuffed, Plaintiff was taken to punitive segregation.  On the way to punitive segregation, Plaintiff told Defendant Cooper that the taser wires were getting tangled in his legs and he was afraid of tripping.  Plaintiff asked if he could get untangled. Defendant Cooper said "I don't care about you tripping you're a tuff guy right?  So do what you want to do!  You do think your tuff right?"  (*Id.* at Page ID#14.) Plaintiff responded that he did not think he was tough, but he told Defendant Cooper "[C]learly you do!"  (*Id.*)  After Plaintiff made that comment Defendant Cooper slammed Plaintiff to the ground and pinned Plaintiff down with his knee.  Defendant Cooper called out that Plaintiff should stop resisting.  Plaintiff alleges that Defendant Cooper did this to justify his decision to slam Plaintiff to the ground "using unnecessary excessive force."  (*Id.*)  Plaintiff was not trying to resist Defendant Cooper.  Defendant Cooper then tightened Plaintiff's handcuffs around his wrist such

3

that the handcuffs cut into Plaintiff's skin and cut off the circulation to Plaintiff's hands, causing them to be numb for hours after the handcuffs were removed.

After a short time in punitive segregation Plaintiff began having sharp pains in his lower back. Plaintiff asked Defendant Tate for his "TENS Unit." (*Id.*) Plaintiff states that a TENS unit is "a medical device that was prescribed . . . by the MDOC's own health service providers to help me cope with my on going chronic back pains." (*Id.*) After asking an unspecified person about whether Plaintiff could have his TENS unit, Defendant Tate told Plaintiff it was a medical problem so Plaintiff should talk to the nurse during rounds the next day. Plaintiff alleges that he suffered unnecessary excruciating pain all night.

The next morning, on June 25, 2013, Plaintiff asked Defendant Thrush for his TENS unit. Plaintiff explained that he was in terrible pain and that he had a medical detail for the TENS unit. Defendant Thrush explained to Plaintiff that he would have to see if Plaintiff was allowed to have the TENS unit while in punitive segregation; if so, Defendant Thrush would get the TENS unit for Plaintiff. Defendant Thrush never returned. Plaintiff also asked Captain Allen for his TENS unit. Like Defendant Thrush, Captain Allen told Plaintiff that he would find out if Plaintiff could have the TENS unit. Captain Allen never returned. Plaintiff did not receive his TENS unit or any other help for his back, so he continued to suffer tremendous pain.

On June 26, 2013, Plaintiff once again asked Defendant Thrush for help getting his TENS unit or any other help for his back pain. Defendant Thrush said he would check if Plaintiff could have his TENS unit, but he never returned. Plaintiff continued to suffer. Plaintiff tried talking with Lieutenant Wood about getting the TENS unit, but Lieutenant Wood told Plaintiff he did not have time to talk. Lieutenant Wood said that he would come back, but he never did. Plaintiff continued to suffer. For another two days Plaintiff tried to get his TENS unit because he was in terrible pain. Plaintiff alleges that he felt suicidal because he was in excruciating pain, he could not sleep and no one seemed to want to help him. Plaintiff could not believe what was happening to him just because he filed a grievance.

On June 28, 2013, Plaintiff asked Defendant Harding to help him get his TENS unit. He explained to Defendant Harding that he was in terrible pain and had been trying to get the TENS unit since June 24, 2013. Defendant Harding told Plaintiff that she would send an email to the property room and to Defendant Sutton to try and get the TENS unit. Defendant Harding never returned. Plaintiff did not get his TENS unit.

On June 30, 2013, Plaintiff again spoke with Defendant Harding and asked her for anything to help deal with his back pain. Defendant Harding told Plaintiff that she would send another e-mail to the Defendant Property Room Officers

Unknown Parties ##1-2, because the TENS unit was in the property room and "neither of them wanted to go into" Plaintiff's property and get the TENS unit out. (*Id.* at Page ID#17.) Later that same day, Plaintiff spoke with Lieutenant Scott, for the first time, and explained to her what was going on. Lieutenant Scott got very upset and told Plaintiff that she would personally make sure that Plaintiff got the TENS unit. Lieutenant Scott came back to Plaintiff's cell about 20 minutes later with his TENS unit. Plaintiff was made to suffer for six days before he received his TENS unit. None of the other defendants with whom he had spoken ever helped him get his TENS unit nor did they offer to help him get any other kind of pain relief.

On June 30, 2013, Plaintiff did not eat breakfast or lunch. Defendant Dulaney was the officer assigned to distribute Plaintiff's breakfast and lunch food trays. When Defendant Dulaney came to deliver his meals, Plaintiff saw a sinister smile on Defendant Dulaney's face and was afraid to eat anything that Defendant Dulaney delivered.

On July 2, 2013, Defendants Young and Lauer told Plaintiff that they were not going to allow him back in the MTU compound and that he would be transferred once he finished his punitive segregation. Plaintiff alleges that this transfer was done maliciously, was motivated by Defendants Dulaney and Darnell and was intended to retaliate against Plaintiff.

*       *       *

Plaintiff alleges that if Defendants Dulaney and Darnell had not retaliated against him for filing a grievance against Defendant Dulaney in the first place, then none of the other defendants would have violated his constitutionally protected rights, state law and/or MDOC policy. Plaintiff alleges that the MDOC failed to protect Plaintiff from Defendants' retaliation and was deliberately indifferent and/or grossly negligent with respect to its obligation to keep Plaintiff safe. Plaintiff alleges that Defendants took adverse action against Plaintiff for engaging in protected conduct, used excessive force against Plaintiff, denied Plaintiff medical treatment and violated his due process rights.

Plaintiff asserts claims for the following: retaliation; denial of equal protection; cruel and unusual punishment; violation of due process; violation of MDOC policies and state law, including conduct unbecoming of an officer, dereliction of duty and falsification or altering documents; inhumane treatment; and discrimination and harassment.

For relief, Plaintiff requests compensatory, emotional and punitive damages, along with an order directing the MDOC to fire all defendants, create a review board to investigate all occasions in which a taser is used, create a grievance board of

review to receive and investigate all grievances, create a religious review board to direct the MDOC in all matters related to religion, and order that all federal funding to the MDOC be terminated until the MDOC creates the review boards previously identified.

Opinion (docket no. 6 at pp. ID## 101-06, 108-09 (footnotes omitted).

The claims alleged in plaintiff's complaint arise from the June 24, 2013 incident. While plaintiff's complaint characterizes him as the victim of that incident, MDOC records reflect that he was the aggressor. Plaintiff was charged with threatening behavior and assault and battery for his actions on that date. *See* Class I Misconduct Hearing Report (attached to complaint) (docket no. 1-1 at p. ID# 52). After an administrative hearing on July 1, 2013, plaintiff was convicted of insolence "for cussing and making abusive statements to [Darnell] that were intended to harass, demean and alarm him" and of assault and battery for "physically resisting [Darnell] under escort." *Id.*

## II. Summary judgment

### A. Legal standard

Defendants seek summary judgment on plaintiff's claims. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B.      Plaintiff's complaint

Plaintiff included a "verification" to his 30-page complaint, presumably to support his response to future motions for summary judgment. *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) (a verified complaint has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment). Plaintiff attempted to verify his complaint pursuant to 28 U.S.C. § 1746, which provides that in any matter which "is required or permitted to be

supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same . . . may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury." 28 U.S.C. § 1746(2). Such statements must be made in substantially the following form "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".  28 U.S.C. § 1746(2).

However, plaintiff's complaint did not comply with the requirements of § 1746. Plaintiff did not declare that his statements were "true and correct" as required by the statute, but diluted that language stating:

> I, the plaintiff Ronald L. Davis, hereby verify that the facts alleged herein are true and I also certify under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and understanding.  Executed on this 01 day of NOV. 2013.

Compl. (docket no. 1 at p. ID# 30).  The Court does not view this diluted "verification" as a declaration authorized by 28 U.S.C. § 1746.

In addition, plaintiff's "verified complaint" does not create a genuine issue of material fact sufficient to defeat a motion for summary judgment, because plaintiff does not state that these facts are based upon his "personal knowledge" as required by Fed. Rules Civ. Proc. 56(c)(4), which provides that a declaration used to support or oppose a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Consistent with Fed. Rules Civ. Proc. 56(c)(4) and its predecessor, courts have applied a strict personal knowledge requirement to affidavits or

declarations submitted in summary judgment proceedings. *See, e.g., Totman v. Louisville Jefferson County Metro Government*, 391 Fed.Appx. 454, 464 (6th Cir. 2010) (to constitute evidence sufficient to support or oppose a motion for summary judgment, an affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated;" thus, a complaint which included a verification stating facts that are true and correct to the best of the affiant's "knowledge and belief" indicated that the allegations of the complaint went beyond the plaintiff's personal knowledge, that the allegations extended to matters within the plaintiff's "beliefs," and that the plaintiff's "beliefs" did not meet the evidentiary standard set forth in Fed. Rules Civ. Proc. 56(e)(1) (predecessor to Fed. Rules Civ. Proc. 56(c)(4)).

Here, plaintiff diluted the statutory language by stating that the matters in the complaint were "true and correct to the best of my knowledge and understanding." Compl at p. ID# 30. As the Court observed in *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 139 (2d. Cir. 2009), "the common expression 'to the best of my knowledge' . . . seems to inject a level of uncertainty into just how sure the declarer is of the truth of the asserted fact." Similarly, plaintiff's use of the expression "to the best of my . . . understanding" also injects a level of uncertainty as to the truth of the facts asserted. "[F]acts alleged on 'understanding' like those based on 'belief' or on 'information and belief', are not sufficient to create a genuine issue of fact." *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1377 (9th Cir.1978). *See Plaskolite, Inc. v. Zhejiang Taizhou Eagle Machinery Co., Ltd.*, No. 08-487, 2008 WL 5190049 at *4 (S.D. Ohio Dec. 9,2008) (affidavits in support of a motion for summary judgment made upon "understanding" are properly subject to a motion to strike); *Carey v. Beans*, 500 F. Supp. 580, 583 (E.D. Pa. 1980) (same).

Plaintiff's status as a *pro se* litigant will not excuse his failure to prepare a verification sufficient to support a motion for summary judgment. "*Pro se* litigants are required to follow the rules of civil procedure." *Mooney v. Cleveland Clinic Foundation*, 184 F.R.D. 588, 590 (N.D. Ohio 1999). A *pro se* plaintiff "volitionally assumes the risks and accepts the hazards which accompany self-representation." *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 561 (6th Cir. 2000). "While courts have historically loosened the reins for pro se parties, the right of self-representation is not a license not to comply with relevant rules of procedural and substantive law." *Eagle Eye Fishing Corporation v. United States Department of Commerce*, 20 F.3d 503, 506 (1st Cir. 1994) (internal citations and quotation marks omitted). Accordingly, the Court will not consider plaintiff's "verified" complain as having the same force and effect as an affidavit for purposes of resolving defendants' motion for summary judgment.

### III. Exhaustion of administrative remedies

### A. Legal standard

Defendants seek summary judgment on the ground that plaintiff failed to exhaust his administrative remedies with respect to his Eighth Amendment claim. The Prison Litigation Reform Act (PLRA) provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

### B.    MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007).  A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P.  If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R.  The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely.  Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).  Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original).  The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V.  If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB.  Finally, if a prisoner is dissatisfied with the Step II response, or does not

receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section.  *Id.* at ¶ FF.

### C.     Plaintiff's grievances

Defendants contend that plaintiff failed to properly exhaust his claims asserted against CO Dulaney, CO Darnell, CO Lehman and CO Cooper.  In support of this motion, defendants rely on the MDOC Prisoner Step III Grievance Report, which indicates that plaintiff filed two Step III grievance appeals while incarcerated at MTU, those being Grievance no. MTU-13-07-0853-17z ("853") and Grievance no. MTU-13-06-0722-03f ("722").  *See* MDOC Prisoner Step III Grievance Report (docket no. 25-3 at p. ID# 196).  In his response, plaintiff contends that he exhausted another grievance, no. MTU-13-06-00766-017b ("766").

### 1.     Grievance no. 853

In grievance no. 853 plaintiff complained that between June 24, 2013 and June 29, 2013, defendants R.N. Harding and Lt. Scott failed to retrieve his TENS unit. Grievance No. 853 (docket no. 25-3 at p. ID# 200).  Plaintiff's grievance also mentioned his requests made to defendants Capt. Allen and R.N. Thrush on June 26, 2013.  Defendants Harding, Scott, Allen and Rush do not seek summary judgment for lack of exhaustion with respect to this claim involving the TENS unit.  However, these four defendants do seek summary judgment on the merits this claim. *See* discussion, *infra*.

### 2.     Grievance no. 722

In grievance no. 722, plaintiff complained that on June 16, 2013, CO Delaney would not let him use a bathroom on a different floor of the housing unit.  Grievance no. 722 (docket no.

12

25-3 at pp. ID## 205, 207-08).  Grievance no. 722 does not apply to any of the matters alleged in plaintiff's complaint.

### 3.     Grievance no. MTU-130600-766-017b ("766")

In his response, plaintiff supplied a copy of the Step I form for grievance no. 766 and contends that he exhausted this grievance through Step III.  Grievance No. 766 (docket no. 35-1 at p. ID# 299).  In this grievance, plaintiff stated that on June 24, 2013, between 13:10 and 13:20 hours, CO Dulaney retaliated against plaintiff, telling plaintiff that he received a grievance written by plaintiff and that it was going to end up hurting plaintiff.  *Id.*  Then, the "retaliation became reality" at 13:35 hours, when plaintiff was in the big yard and CO Darnell called him over for a shakedown. *Id.*  Plaintiff was kicked off of the yard for writing a grievance against Dulaney.  *Id.*  Plaintiff was not interviewed after filing the grievance because he was transferred.  *Id.*   Plaintiff presented evidence that after his transfer to a different correctional facility, his Step II response in grievance no. 766 was received at MTU on August 9, 2013.  *Id.* at p. ID# 301.  The receipt form advised plaintiff that if he did not receive a Step II response by August 30, 2013, then he could submit a Step III appeal to the Director's Office.  *Id.*  Plaintiff also provided evidence that on or about September 9, 2013, he mailed a self-styled Step III appeal to the Director's Office for grievance no. 766.  *Id.* at pp. ID## 303 and 304.  Plaintiff recounts the history of grievance no. 766 in a declaration (which plaintiff refers to as an affidavit).  *See* Plaintiff's Affidavit (docket no. 35-1 at pp. ID## 296-97). The evidence submitted by plaintiff with respect to grievance no. 766 appears inconsistent with the MDOC's Step III  Grievance Report, which does not reflect this particular grievance.   Defendants did not attempt to clear up this inconsistency; indeed, they did not file a reply to plaintiff's response.

### 4.     Conclusion

13

Viewing the facts in the light most favorable to the non-movant (plaintiff), a genuine issue of material fact exists with respect to whether plaintiff properly exhausted grievance no. 766, which relates to his retaliation claim against CO Dulaney and CO Darnell which arose on June 24, 2013. Accordingly, defendants' motion should be denied to the extent they seek summary judgment for lack of exhaustion of this claim. However, plaintiff has not properly exhausted any other claims against CO Dulaney, CO Darnell, CO Lehman and CO Cooper. *See Jones,* 549 U.S. at 218; *Woodford*, 548 U.S. at 90-91. Accordingly, defendants' motion for summary judgment for lack of exhaustion should be granted as to plaintiff's remaining claims against CO Dulaney and CO Darnell, and as to all of plaintiff's claims against CO Lehman and CO Cooper.

### IV. Plaintiff's Eighth Amendment claims against defendants Harding, Thrush, Woods and Tate

### A. Legal standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97

14

(l976).   A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind.  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition.  *Hudson*, 503 U.S. at 8-9.  With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."  *Id.* at 8 (internal citations and quotation marks omitted).  Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.*  at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety.  *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).  To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation.  *Id.* at 835.  "The prison official's state of mind must evince deliberateness tantamount to intent to punish."  *Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005).  "It is obduracy and wantonness, not inadvertence or error in good faith, that

characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

> **B.     Defendants' affidavits in support of the motion for summary judgment**

In her affidavit, R.N. Harding denies that she failed to provide plaintiff with his TENs unit.  Harding stated that on June 28, 2013, she saw plaintiff during her morning rounds in the segregation unit, and that plaintiff requested his TENs unit at that time.  Harding Aff. at ¶ 5 (docket no. 25-7).  Harding explained, "[b]ecause I did not have possession or access to his TENs unit, I informed [plaintiff] that I would notify custody to retrieve it from his property." *Id.*  That same day, Harding sent an e-mail to Lt. Sutton and Property Officer Griffith "informing them that [plaintiff] had been placed in segregation and should be provided with his TENs unit." *Id.* at ¶ 6.  Harding "also provided a description of what the TENs unit looked like." *Id.*  Harding stated that she was not informed that plaintiff did not receive his TENs unit. *Id.* at ¶ 7.

In his affidavit, CO Tate stated as follows:

5.     On June 28, 2013, I started my shift at 1400 hours and observed Davis in the segregation showers waiting to be striped [sic] searched.

6.     I asked Davis why he was in segregation and he said "They got me with the taser."  I asked him if it hurt and he said "No, I didn't feel it."

7.     I then conducted a strip search on him and Davis was escorted to a segregation cell.

8.     A couple hours later I asked Davis how he was feeling and he said "Ok, but I need my TENs unit."  I told Davis to let me check and see if he could have the unit.

9.     I was informed that Davis could have his TENs unit, but since his property hadn't been sent over to segregation yet, I was unable to get it for him.

10.     I told Davis what I had learned and then asked him if he wanted to see Healthcare.  Davis said "No, I'm straight."

11.     At no time afterwards, was I ever informed that Davis did not receive his TENs unit.

Tate Aff. (docket no. 25-10 at p. ID# 248).

In his affidavit, R.N. Thrush also denied that he failed to provide plaintiff with his TENS unit.  Thrush stated that he saw plaintiff during his rounds in the segregation unit and that plaintiff did request his TENS unit.  Thrush Aff. at ¶ 5 (docket no. 25-8 at p. ID# 242).  Thrush explained that, "Because I did not have possession or access to his TENs unit, I informed Unit Segregation custody staff that [plaintiff] would need his TENs unit and that custody would need to retrieve it from his property."  *Id.*  Thrush stated that he was not informed that plaintiff did not receive his TENs unit.  *Id.*

Finally, In his affidavit, Lt. Wood stated that, "[a]t no time did [plaintiff] ever inform me that he needed his TENs unit or any type of electric therapy device."  Wood Aff. at ¶ 5 (docket no. 25-9 at p. ID# 245).

Plaintiff filed a declaration (referred to as an affidavit) stating that Lt. Wood's statement that "at no time did Davis ever inform me that he needed his TENs unit or any type of electric therapy device" was false.  Plaintiff's Aff. (docket no. 35-1 at p. ID# 306).  Plaintiff also disputed portions of CO Tate's affidavit in which Tate stated that plaintiff did not feel the taser, that he was  OK and did not need to see healthcare.  *Id.*

In his response, plaintiff pointed out that by their own affidavits, R.N. Harding, R.N. Thrush and CO Tate "show that the plaintiff was in serious need of medical treatment but was denied it" and that "the defendants are attempting to play the shell game with this court by trying to push

17

the blame of their deliberate indifference upon some one else." Plaintiff's Response (docket no. 35 at p. ID# 288). The Court disagrees. Defendants' affidavits establish that they did not possess the requisite intent to support a deliberate indifference claim. There is no evidence that Lt. Wood discussed this matter with plaintiff. With respect to R.N. Harding, R.N. Thrush and CO Tate, it is uncontested that they did not have access to plaintiff's TENS unit but took steps to obtain the unit from the MDOC staff which had access to the unit. In summary, viewing the evidence in the light most favorable to the non-moving party (plaintiff), none of the defendants disregarded plaintiff's request for the TENS unit, or took actions tantamount to an intent to punish plaintiff. *See Farmer*, 511 U.S. at 837; *Miller*, 408 F.3d at 813.

Furthermore, plaintiff's Eighth Amendment claim fails on a separate ground. Plaintiff's claim arises from an alleged five-day delay in medical treatment, i.e., he was sent to segregation on June 25, 2013 and did not receive his TENS unit until June 30, 2013. "[A]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001). Here, plaintiff has failed to place any verifying medical evidence in the record to show that there was a delay in medical treatment (i.e., delivery of the TENS unit) or that any such delay had a detrimental effect on him. Accordingly, defendants Harding, Thrush, Tate and Wood's motion for summary judgment should be granted.

V.   **Plaintiff's First Amendment retaliation claims against defendants Dulaney and Darnell**

18

To state a claim alleging retaliation for exercising a constitutional right, a plaintiff must show that (1) he engaged in protected conduct; (2) the defendant took an adverse action against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) that the adverse action was taken (at least in part) because of the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999) (en banc). To establish the causation element of a retaliation claim, "the plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct." *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001), *citing Mount Health City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977). "[B]ecause prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, we are careful to require non-conclusory allegations." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks omitted).

Plaintiff's retaliation claim consists of a brief exchange which occurred between plaintiff, CO Dulaney and CO Darnell on June 24, 2013. As discussed, Dulaney allegedly told plaintiff that the grievance plaintiff filed against Dulaney would hurt plaintiff much more than it would hurt Delaney and that plaintiff would not have a good day since he was writing so many grievances. Opinion at pp. ID## 101-02. Darnell allegedly told plaintiff, "You wrote a grievance against Dulaney didn't you. Now get the hell off of my yard and go write another grievance!" *Id.* at p. ID# 102. Plaintiff's retaliation claim fails as a matter of law.

This retaliation claim was resolved at plaintiff's administrative hearing held on July 1, 2013. At that hearing, plaintiff presented his claim of retaliation as a defense to the misconduct charges of threatening behavior and assault and battery. The hearing officer rejected plaintiff's

defense that CO Darnell was retaliating against plaintiff "for a grievance he filed on another officer." Class I Misconduct Hearing Report (docket no. 1-1 at p. ID# 52).   Although the hearing officer did not find plaintiff guilty of threatening behavior, he did find plaintiff guilty of insolence (i.e., "cussing and making abusive statements to [Darnell] that were intended to harass, demean and alarm him") and assault and battery.  *Id.*  In doing so, the hearing officer rejected plaintiff's claim that the charges against him were in retaliation for writing grievances.  Plaintiff cannot revive his retaliation claim in this lawsuit.   "A finding of guilt based upon some evidence of a violation of prison rules 'essentially checkmates [a] retaliation claim.'"  *Jackson v. Madery*, 158 Fed. Appx. 656, 662 (6th Cir. 2005), quoting *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir.1994).  Accordingly, defendants Dulaney and Darnell's motion for summary judgment should be granted with respect to the retaliation claim.

## VI.    Plaintiff's state law claims

The Court previously noted that plaintiff's complaint "set[] out a laundry list of state-law claims, including, violation of MDOC policy, conduct unbecoming a department employee, dereliction of duty and falsification or altering documents."  Opinion (docket no. 6 at p. ID# 127). Here, the court exercised its supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367, because those claims appeared to be intimately related to the alleged § 1983 violation.  *See* 28 U.S.C. § 1367(a) ("the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form a part of the same case or controversy").  The dismissal of plaintiff's federal claims against defendants, however, requires the court to re-examine the issue of supplemental jurisdiction for state law claims against these defendants.  Under 28 U.S.C. § 1367(c)(3), a district court may decline to

exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction." Once a court has dismissed a plaintiff's federal claim, the court must determine whether to exercise, or not to exercise, its supplemental jurisdiction under § 1367. *See Campanella v. Commerce Exchange Bank*, 137 F.3d 885, 892-893 (6th Cir. 1998). As a general rule "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254-1255 (6th Cir. 1996). Here, the Court has rejected plaintiff's federal claims. There is no reason to retain supplemental jurisdiction over plaintiff's state law claims. Accordingly, the court should dismiss the state law claims asserted against all defendants.

### VII. Recommendation

For the reasons set forth above, I respectfully recommend that defendants' motion for summary judgment (docket no. 24) be **GRANTED**.

I further recommend that the state law claims against defendants be **DISMISSED** pursuant to 28 U.S.C. § 1367.

I further recommend that this action be **DISMISSED**.

Dated: March 20, 2015          /s/ Hugh W. Brenneman, Jr.
                               Hugh W. Brenneman, Jr.
                               United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).